Rick Richmond (SBN 194962)
*rrichmond@larsonllp.com*
Amelia L.B. Sargent (SBN 280243)
*asargent@larsonllp.com*
Ranja F. Rasul (SBN 336221)
*rrasul@larsonllp.com*
Jasmine M. Johnson (SBN 351979)
*jjohnson@larsonllp.com*
**LARSON LLP**
555 South Flower Street, 30th Floor
Los Angeles, California 90071
Telephone: (213) 436-4888
Facsimile:  (213) 623-2000

Attorneys for Plaintiff Adaptamed, LLC

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAPTAMED LLC,<br><br>           Plaintiff,<br><br>     vs.<br><br>WC HEALTH MSO LLC d/b/a WC HEALTH, a corporation, and COMMURE, INC., a corporation, and DOES 1-100,<br><br>           Defendants. | Case No.  **'26 CV 2486 JO    VET**<br><br>**COMPLAINT FOR:**<br>**1. BREACH OF CONTRACT**<br>**2. MISAPPROPRIATION OF TRADE SECRETS UNDER 18 U.S.C. §§ 1836 et seq., AND CALIFORNIA UNIFORM TRADE SECRETS ACT**<br>**3. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br>**4. INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**<br>**5. UNFAIR COMPETITION IN VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 et seq., AND**<br>**6. COMPUTER FRAUD AND ABUSE UNDER 18 U.S.C. § 1030(a)(4)**<br>**7. COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT UNDER CALIFORNIA PENAL CODE § 502**<br>**8. UNJUST ENRICHMENT**<br>**DEMAND FOR JURY TRIAL** |

LARSON
LOS ANGELES

Case No.

Plaintiff Adaptamed LLC ("Adaptamed") hereby complains of Defendants WC Health MSO LLC ("WC Health") and Commure, Inc. ("Commure") (collectively, "Defendants") and alleges as follows:

## INTRODUCTION

1.    A big company called Commure wanted the technology of a little company named Adaptamed.  The big company used log-in credentials assigned to one of the little company's customers, WC Health, to access and educate itself about the technology.  The big company liked what it saw.  The big company tried to "partner" with the little company.  The "partnering" approach did not work.  The big company did not disclose its unauthorized access to the little company's technology.  The big company spent several months secretly accessing the little company's technology so that it could learn everything it needed to know before it got caught.  Then it stole the little company's customer and refused to answer any questions when the little company became aware of what was happening behind its back.

2.    The big company's silence is deafening.  Using log-in credentials that do not belong to you breaks a cardinal rule known to every person who uses a company computer.  And taking something that belongs to someone else is always wrong.

3.    Commure is a $6 billion healthcare technology company.  Commure's core platform consists of a patchwork of technologies obtained through serial aggressive acquisitions of much smaller targets.  Commure's apparent objective is to stitch these technologies together and then sell its patchwork quilt to investors in an IPO for a quick and handsome profit.  "Speed above all else" is one of Commure's main mantras.  That mantra is more than faintly redolent of the oft-cited and oft-criticized Silicon Valley view that the best course is to "move fast and break things."

4.    Commure is headquartered in Silicon Valley.  Commure is backed by big money.  Silicon Valley funders, such as General Catalyst, Founders Fund, Y Combinator, Nvidia, 8VC, and Sequoia Capital, all have a stake in Commure.

LARSON
LOS ANGELES

Silicon Valley funders are not known for patient progress.  They want and expect prompt results, especially in the fast-moving and high-tech arena in which they like to play.  Commure is the big company, backed by big money, in this sordid saga.

5.   Adaptamed is the little company.  Adaptamed is much smaller than Commure.  It is a home-grown company.  Adaptamed was founded by Dr. Kumara Prathipati.  He is a practicing physician in San Diego.  Dr. Prathipati is 72 years old.  He has treated patients for decades.  He continues to treat patients in the San Diego area today.

6.   Dr. Prathipati built his own healthcare technology in his off-hours, with his blood, sweat, and tears.  Every funding dollar came out of his own pocket, or the pocket of one other practicing physician friend in San Diego.  These practicing doctors are not big money.  They do not believe in mantras like "speed above all else" or "move fast and break things."  They patiently built and funded their behavioral health technology over the course of more than a decade.  To develop the technology, Dr. Prathipati called upon his personal experience with thousands of patients, as he helped those patients with their most serious problems, keeping track of his activities and their progress in his patient notes.

7.   Dr. Prathipati developed his technology at a time when many people have already retired.  What he built is amazing.  What he built is valued by many customers who pay good money to use his technology.  What he built caught the eye of young Silicon Valley upstarts, who appear eager to quickly acquire Dr. Prathipati's sweat-equity technology and monetize it for their own selfish interests.

8.   As detailed below, in September 2025, Commure approached Adaptamed under the guise of exploring a partnership focused on Adaptamed's proprietary platform, known as EHRYourWay.  The EHRYourWay platform provides a comprehensive EHR solution to the behavioral health market.  EHR stands for Electronic Health Records.  Commure did not tell Adaptamed it was already surreptitiously and unlawfully accessing EHRYourWay using the borrowed

credentials of Adaptamed's (now former) customer, WellCare Health, known as WC Health.

9. Commure was ostensibly in talks to "partner" with Adaptamed to shore up its own nascent EHR platform, called Athelas Air. During those talks, Commure repeatedly, secretly, and unlawfully accessed EHRYourWay over a period of nearly seven months using WC Health's log-in credentials. Three of the log-ins were obtained under false pretenses—intended for WC Health employees, not Commure. At least three other logins, assigned to WC Heath employees, were also shared among Commure employees across the globe. On information and belief, Commure took advantage of this unauthorized access to study and steal the architecture and logic of the EHRYourWay platform to accelerate the development of Commure's weaker Athelas Air, so that it would be able to compete in the behavioral EHR end market.

10. This case is not about the data owned by WC Health, or patient data. That data is owned by the patients and WC Health. This case is about the proprietary information that makes up the EHRYourWay platform, i.e., the engine that powers the platform's delivery, its internal architecture, and its internal processes. Adaptamed owns all of that.

11. Commure's unlawful access of EHRYourWay directly violated numerous restrictions in WC Health's contractual license with Adaptamed, including Article 1.1, which permits access to only WC Health's employees; Article 1.2, which forbids disclosure and sharing of logons; and Article 1.5, which restricts users from providing access to third-parties, using "back door" bots to scrape data from the platform, and creating derivative works or reverse engineering the platform's information. Commure and WC Health unlawfully conspired to violate all of these contractual restrictions, and then proceeded to do so.

12. Adaptamed discovered Commure's and WC Health's unlawful scheme in early February 2026. WC Health had been Adaptamed's trusted customer for over

10 years.  The discovery began with WC Health's abrupt attempt to cancel its term contract, which was otherwise not set to expire or renew until July 2026.  WC Health did so by notifying Adaptamed by phone on February 3, 2026 that it intended to transition certain of its users to a new EHR platform, which Adaptamed later discovered was Commure's new EHR offering.

13. Only four days earlier, on January 30, 2026, a member of Commure's Strategy and Partnerships team, Zachary Little, met virtually with Adaptamed to discuss a hoped-for "partnership" between Commure and Adaptamed, and to "envision next steps."  Little revealed that Commure had launched its Athelas Air product in July 2025.  He said Athelas Air was "very lightweight" and was then serving only small markets like physical therapy.  By contrast, WC Health told Adaptamed that Commure was delivering proof of concepts of WC Health's required features "within a day" of the request.  During this late January 2026 meeting, Commure's Little did not disclose that Commure had already been accessing EHRYourWay unlawfully for 179 days.

14. When WC Health notified Adaptamed of its sudden intent to cancel, Adaptamed was concerned.  Adaptamed started an investigation.  Adaptamed discovered highly suspicious activity indicative of the use of bots scraping the EHRYourWay system for data.  Initially believing WC Health's accounts had been compromised, Adaptamed took steps to secure WC Heath's patient data.

15. Adaptamed's investigation continued.  It became increasingly clear what had happened behind Adaptamed's back.  Commure had been accessing EHRYourWay with unauthorized logons, sharing login credentials of WC Health employees, querying the system with bots hundreds of thousands of times per month, and, most concerningly, potentially compromising the integrity and security of patient data, leading Adaptamed to notify WC Health of a potential data breach.

16. Days and weeks of WC Health's and Commure's deafening silence mounted.  Despite multiple requests, WC Health and Commure have refused to

LARSON
LOS ANGELES

5

COMPLAINT

Case No.

respond to even the most basic questions:  What is the nature of Commure's activities within Adaptamed's systems?  What are the names and locations of the people behind Commure's unauthorized accounts?   Why were Commure employees using logins assigned to WC Health employees, when doing so seems to be in violation of HIPAA (45 CFR § 164.312)?

17. Commure and WC Health have refused to answer those obvious questions.  This leaves Adaptamed with no choice but to assume the worst.  Commure and WC Health conspired to and did come up with a plan to allow Commure to unlawfully access EHRYourWay for the purpose of copying Adaptamed's proprietary, confidential, and trade secret features.  Commure did this so it could steal WC Health's business.  Worse, Commure did this to give itself an unfair head start to compete more broadly in the behavioral health EHR market.

## NATURE OF THE ACTION

18. This is an action for (1) breach of contract under California law; (2) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 et seq., and under the California Uniform Trade Secrets Act ("CUTSA"); (3) intentional interference with prospective economic advantage under California law; (4) intentional interference with contractual relations under California law; (5) unfair competition in violation of Cal. Bus. & Prof. Code §§ 17200 et seq.; (6) computer fraud and abuse under 18 U.S.C. § 1030(a)(4) ("CFAA"); (7) computer data access and fraud under California Penal Code § 502; and (8) unjust enrichment under California law.

## THE PARTIES

19. Plaintiff Adaptamed is a California corporation with a principal place of business in San Diego, California.

20. Upon information and belief, Defendant WC Health MSO LLC is a Nevada corporation with a principal place of business in Las Vegas, Nevada.

/ / /

21. Upon information and belief, Defendant Commure is a California corporation with a principal place of business in Mountain View, California.

22. Adaptamed is ignorant of the true names and capacities of the parties sued herein as DOES 1 through 100, inclusive, whether individual, corporate, or otherwise, and therefore sues these defendants by such fictitious names. Adaptamed will seek leave to amend its complaint to assert their true names and capacities when they have been ascertained. Adaptamed is informed and believes and, based thereon, alleges that all defendants sued herein as DOES 1 through 100 are in some manner responsible for the acts and omissions alleged herein.

## JURISDICTION AND VENUE

23. This Court has original and exclusive subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c), because this is a private federal civil action arising under the DTSA, 18 U.S.C. §§ 1836, et seq., and the CFAA, 18 U.S.C. 1030(a)(4).

24. This Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a), because they are so related to the federal claims they form part of the same case or controversy and derive from a common nucleus of operative facts.

25. The acts and transactions complained of herein were conceived, carried out, made effective, and had effect within the State of California and this District.

26. Venue is proper under 28 U.S.C. §§ 1391(b) and 1391(c) because a substantial part of the events or omissions giving rise to the claims and the threatened and actual harm to Adaptamed occurred in this District because of Defendants' conduct as alleged herein. Venue is further proper pursuant to a forum selection clause contained in the operative contract out of which this dispute and these claims have arisen.

/ / /

/ / /

LARSON
LOS ANGELES

7

COMPLAINT

Case No.

## RELEVANT FACTUAL BACKGROUND

**A.    Dr. Prathipati Founds Adaptamed and Creates EHRYourWay**

27. At 72 years old, most professionals have long since retired.  Dr. Prathipati is not like most professionals.  After completing medical school in India, Dr. Prathipati immigrated to the United States where his brilliance was recognized early in his career, earning him a prestigious fellowship at the Yale School of Medicine in 1977.  Dr. Prathipati completed his residency and board exams in the United States.  He has been a practicing physician now for more than 45 years.

28. Dr. Prathipati is the embodiment of grit and purpose.  While maintaining his clinical practice, Dr. Prathipati turned his relentless work ethic toward solving a glaring problem in healthcare technology.  As a practicing doctor, Dr. Prathipati saw firsthand how existing EHR systems failed behavioral health providers and their patients.  He recognized that traditional medical EHRs were not designed for the complex, variable workflows of behavioral health care.  Dr. Prathipati recognized that EHR shortcoming was harming providers and patients alike.

29. Dr. Prathipati is a relentless problem solver and innovator.  Motivated by his desires to improve patient care, and to enable clinicians to practice more efficiently, he committed himself to building a solution tailored to the behavioral health market.  Over nearly 15 years, Dr. Prathipati created, built, and continuously refined his system, from the ground up.  Dr. Prathipati personally led the design and development of his own proprietary behavioral health EHR platform, EHRYourWay.

30. Dr. Prathipati did not build EHRYourWay in a sterile Silicon Valley incubator with the benefit of millions of dollars in venture capital.  Without institutional investors to lean on, Dr. Prathipati and his fellow doctor colleague self-funded every line of code, every server, and every hour of labor needed to perfect his system.

/ / /

31. Beyond mere financial investment, building EHRYourWay required hundreds of hours of listening to prospective and existing customers, developing bespoke functionality suited to their needs, and repeatedly re-engineering the product based on real-world use.  Dr. Prathipati played the role of engineer, developer, and implementer, while simultaneously serving as a one-man C-suite, acting as CEO, CTO, CFO, COO, Chief Product Officer, and Chief Revenue Officer.

32. Silicon Valley-based big tech companies often hire armies of developers from top universities to build their programs.  Not Dr. Prathipati.  He chose a harder, more meaningful path.  He returned to his hometown in India—a town largely ignored by the global technology boom hitting the country—with a vision to give back and create meaningful opportunities in the community in which he grew up. He hired raw and inexperienced college graduates from his home-town community. He spent countless hours training them in engineering, implementation, and support. He mentored and guided them into the senior leaders they are today.  As a result, Dr. Prathipati's top employees have remained by his side for an average of more than 10 years, a testament to the deep respect they have for the man that gave them a future they could not otherwise have imagined.

33. Today, Adaptamed remains a lean, family-run operation.  To manage the immense burden of the company's growth, Dr. Prathipati eventually brought in his daughter to serve as COO, while he continues to focus on product development and customer engagement.  The company's growth and success have been the product of Dr. Prathipati's back-breaking work, personal sacrifice, and unwavering determination to help clinicians deliver better care.  Given his age, Adaptamed and its EHRYourWay software will likely be his final business venture and legacy.  It is this legacy that Commure, with the help of WC Health, sought to steal for its own gain.

/ / /

LARSON
LOS ANGELES

9

Case No.

COMPLAINT

**B.      Commure Buys What It Cannot Innovate**

34. Commure is a sprawling, multi-billion dollar conglomerate fueled by hundreds of millions of dollars of venture capital and private equity backing. Valued at approximately $6 billion, it is bankrolled by major Silicon Valley funders such as General Catalyst, Founders Fund, Y Combinator, Nvidia, 8VC, and Sequoia Capital.

35. With a war chest of nearly a billion dollars, and nearly $200 million in annual revenue, Commure does not operate under the same constraints as a self-funded family-run business like Adaptamed.  Indeed, its self-proclaimed main mantra is "speed above all else."  For Commure, it appears the objective is not to slowly develop quality products that actually work for doctors or improve patient care.  Rather, its goal is to scale at a breakneck pace by acquiring a mountain of assets, manufacture a façade of rapid growth, and create a valuation that will inevitably culminate in a massive IPO by 2027, all to the delight of its major investors.

36. Originally, Commure marketed itself as a "radical collaborator."  Its stated mission was to "simplify" healthcare by creating an open platform that would allow different applications to work together.  Commure's "collaborative" mask, however, has quickly fallen away to reveal its strategy of acquisition and consolidation.  Rather than building its own solutions, Commure embarked on a predatory acquisition spree in an effort to buy its way into market dominance:

- In 2021 Commure acquired PatientKeeper, a system designed to improve physician workflow.  PatientKeeper's former owner noted that the sale was supposed to allow both companies to "promote the development of state-of-the-art solutions more quickly than either [company] could accomplish independently."
- In 2023, Commure merged with Athelas, a revenue cycle platform with modules for remote monitoring and internet-connected devices for

telehealth.  Importantly, Commure coveted Athelas' large language model expertise to accelerate the integration of LLMs and workflow automation.

- In 2024, Commure acquired Augmedix to bring in ambient AI medical documentation.

- Also in 2024, Commure seized Memora Health to add digital care navigation to its portfolio.

37. Commure's business model is simple: if it cannot out-innovate a company, it acquires the target company and its valuable technology.  Commure does not appear willing to spend the time necessary to out-innovate.

38. While mergers and acquisitions are its bread and butter, Commure's history suggests a more sinister tactic as well.  In 2024, another healthcare technology company, Canopy Works, Inc., alleged that after its commercial relationship with Commure soured, Commure engaged in a scheme to steal Canopy's "Strongline" safety technology.  Canopy alleged that—despite being bound by strict confidentiality and non-use agreements—Commure reverse engineered and misappropriated Canopy's trade secrets to launch a competing product.

**C.    Commure Steals And Receives an Unlawful Head Start From EHRYourWay**

39. Despite its billions in funding and numerous acquisitions, there was one glaring hole in Commure's portfolio: a mature behavioral health EHR.  While Dr. Prathipati spent nearly 15 years perfecting Adaptamed's EHRYourWay platform for the most complex clinical workflows, Commure's own offerings in this space remained, by its own admission, "lightweight" and underdeveloped.

40. Commure simply lacked the deep, specialized clinical knowledge and logic required to serve the multi-faceted and dynamic behavioral health market.  With the stated goal of an IPO in the short-term, what it also lacked was the time

necessary to develop a mature system.  Commure needed a shortcut, so it set its sights on EHRYourWay.

### 1.    *The EHRYourWay Platform*

41.  As a practicing physician, Dr. Prathipati saw firsthand that traditional EHR systems lacked the foundational architecture to handle the specific, heterogenous, multi-layered requirements of behavioral health such as their granular organizational structures, complex and varied intake, admissions, scheduling, and documentation processes, intricate and high-stakes medication management, and the labyrinthine billing requirements and compliance and reporting obligations that vary based on state, payer mix, and program type.

42.  In the mid-2000s, while these needs were largely ignored by the EHR market, the demand for specialized behavioral health services was expanding quickly in light of regulatory and market changes.  Behavioral health providers were entering this burgeoning and nascent market without the same specialized digital tools available in other fields to support them.  They were forced to learn how to operate their businesses within a complex and evolving environment, with little margin for error.

43.  Dr. Prathipati understood a truth that Commure's "speed above all else" model ignores: you cannot quickly develop a behavioral health EHR in a vacuum without person-to-person interaction.  There is no single way this market operates.  An EHR that actually serves these providers can only be built through an arduous, time-intensive process of acquiring customers one-by-one, listening to their specific needs and requirements, and iterating the product thousands of times, over years, based on real-world clinical scenarios.

44.  As a clinician, Dr. Prathipati knew that providers deeply care about their patients and their individual needs.  In response, he did not build a system that would force doctors to adapt to its constraints.  Instead, Dr. Prathipati built a system that would adapt to them—*Adapt*-a-med.  That is why he architected EHRYourWay

to be a platform engineered specifically for the bespoke nature of behavioral health.

45. Over time, EHRYourWay became one of the most cutting-edge behavioral health EHR systems available.  It is both SOC 2 and ONC certified. EHRYourWay empowers over 18,000 professionals nationwide across the full spectrum of inpatient and outpatient organizations, and handles the entire clinical, operational, and billing lifecycle.

46. EHRYourWay's value to its customers is derived from specific, proprietary combinations of architectures, logics, and workflows.  These include its: (a) "Easy Form" clinical documentation technology, which is at the system's architectural center; (b) program-services architecture, which is the system's backbone and underpins the sub-components and orchestrates the flow of data, logic, and events; (c) form forwarding rules engine; (d) program customizations; (e) clinical quality measures that have been optimized for behavioral health providers; (f) reminder rules technology; (g) document management system; (h) group therapy interface; (i) charge capture billing triggers; (j) transportation billing within so-called 837 claims; (k) fee schedule rules engine; (l) special billing rules logic; (m) custom reports; (n) fully integrated inpatient/outpatient architecture; (o) library of hundreds of pre-built settings allowing for instant implementation of bespoke workflows; and (p) institutional know-how acquired over more than a decade of experience with real-world scenarios.

47. Each of these components is deeply interconnected, reflecting thousands of specific rules and edge cases that Adaptamed and Dr. Prathipati solved across hundreds of implementations.

48. Recognizing that the EHRYourWay system represents a lifetime of professional labor and proprietary innovation—not to mention significant personal financial investment—Adaptamed has put in place security barriers to ensure its confidential information is not accessed or exploited by competitors.

/ / /

LARSON
LOS ANGELES

13
COMPLAINT

Case No.

49. Unlike other "of-the-shelf" software, there are no free trials of EHRYourWay. Adaptamed does not offer online sign-up. Accessing the platform requires a mandatory, guided implementation period typically lasting several months to ensure the system is fine-tuned to each customer. This only occurs after a contract is executed containing additional protective provisions, such as those in the contract with WC Health here.

50. The EHRYourWay platform reflects a foundation that a new market entrant like Commure could not easily replicate without years of similar experience and development. Unauthorized access to the system would provide a competitor like Commure with a substantial headstart and competitive advantage. A bad actor could potentially steal a roadmap of how data enters, transforms, and flows, based on proprietary business logic that Adaptamed spent nearly 15 years developing.

### 2.    *Commure's Purported Outreach Concerning Partnership and Collaboration*

51. In July 2025, Commure launched its own EHR system, Athelas Air. Upon information and belief, Commure knew from the outset that Athelas Air was a hollow shell—a "lightweight" offering that stood no chance of competing with mature behavioral health EHR systems.

52. Unable to build a comparable system honestly, Commure sent its agents to scout Adaptamed under the guise of exploring a partnership. What Commure failed to disclose was that it had also already been secretly accessing Adaptamed's proprietary system since August 2025.

53. On September 25, 2025, Commure agent Tony DiCarlo approached Dr. Lakshmi Prathipati, Dr. Prathipati's wife, at her medical clinic looking for a way into Adaptamed. Dr. Lakshmi Prathipati informed him that EHRYourWay was her husband's life's work, and that DiCarlo should contact him.

54. On October 21, 2025, DiCarlo sent an email to Dr. Prathipati that was both flattering and deceptive. Feigning ignorance about the system Commure had

already been secretly accessing for months, DiCarlo wrote: "After I left, I looked into your EHR, a very impressive build. . . I'd love the chance to meet and see if there is an opportunity for partnership."

55. Throughout November 2025, the pretended let's-be-partners campaign continued. DiCarlo sent a second and third email, proclaiming that EHRYourWay "truly empowers providers" and that there was "strong potential for collaboration."

56. The deception culminated in a series of meetings in early 2026. On January 20, 2026 a posse of Commure agents—Zachary Little, Averill Sutchar, Rika Jitosho, Ramesh Mannangi, and Tony DiCarlo—met with Dr. Prathipati. Three days later, the same group met with Adaptamed's COO and spoke of "partnership models," while simultaneously hiding the fact that Commure had already been secretly accessing Adaptamed's system for nearly seven months.

57. On January 30, 2026, Little scheduled another meeting with Adaptamed's Director of Provider Relations and COO. With Adaptamed's COO running late, Commure's Little showed his hand. He quickly moved from vague talk of a "partnership," to pointed questions about Adaptamed's implementation process. Unaware that she was speaking to a bad actor already raiding her company's confidential information, Adaptamed's Director of Provider Relations began a screen share to provide a demo of how a fee schedule could be set up. Adaptamed's COO arrived shortly thereafter and immediately put a stop to the demonstration. She asked the obvious question. Why had a meeting organized to discuss potential partnership structures resulted in a product demonstration? Little's vague answer was that the demonstration would help him "envision" next steps. Adaptamed's COO then asked a more pointed question. Did Commure even have an EHR offering? Little responded in the affirmative, but conceded Commure's EHR system was "very lightweight" and currently serving only small markets such as physical therapy.

/ / /

### 3.    *Commure's Unauthorized Access of Adaptamed's System*

58. Four days later, on February 3, 2026, WC Health's CIO, John Hong, called Adaptamed to provide a "courtesy" notice that WC Health would be migrating an unknown number of users to a new system, Commure's Athelas Air. Hong proclaimed the decision was a "no-brainer" because Commure had guaranteed a 98% collections rate with the use of its billing product. Hong, however, also indicated that in order for WC Health to use Commure's billing product and take advantage of the 98% guaranteed collections rate, WC Health would also have to transition to Commure's EHR product, Athelas Air.

59. When asked how Commure—which had already conceded its EHR system was "lightweight"—could possibly support the complex, bespoke workflows of a massive organization like WC Health, Hong's answer was telling. Hong claimed Commure had hundreds of developers "in a facility" rapidly building product and delivering proof-of-concepts within a day of each request. Such rapid development set off alarm bells.

60. Suspicious of the unrealistic development speed, Adaptamed started to investigate WC Health's user activity. The results were stunning. Adaptamed identified three non-clinical accounts created on August 6, 2025, shortly after Commure launched Athelas Air, with IDs 2218, 2219, and 2220.

61. After looking into the creation of the three suspicious accounts, it became clear that WC Health had obtained them through deception. Stephany Guerrero, WC Health's RCM Manager, along with Hong, had pressured Adaptamed's account manager to create these logins "ASAP," and vaguely labeled them as billingsupportstaff1, billingsupportstaff2, and billingsupportstaff3. When asked to clarify the accounts, the emails they were associated with, and who would be using them, Guerrero evaded the question.

62. WC Health never disclosed that these keys were destined for a third-party competitor. The keys were handed to Commure. Guerrero took advantage of a

LARSON
LOS ANGELES

16
COMPLAINT

Case No.

decade of trust, and Adaptamed's desire to accommodate an important client, to deceptively secure keys to Adaptamed's house that she could hand over to an unwelcome intruder.

63. Adaptamed's investigation revealed that for over seven months, these three suspicious "biller" accounts were used for anything but billing. While WC Health generates up to 20,000 claims per month, these accounts generated almost zero. Instead, they were used to launch a massive, programmatic assault on Adaptamed's intellectual property. For example, ID 2218 was used to automate Python scripts that bombarded Adaptamed's system, generating nearly three-quarters of a million API events. These requests occurred at "machine speed," ran nearly round-the-clock, and far exceeded what was necessary for normal billing activity. This indicated a targeted, high-volume query pattern that was many multiples above normal usage. Upon information and belief, the activity likewise indicated a systematic "mining" of Adaptamed's foundational architecture and operational logic.

64. Nor did Commure's agents limit themselves to billing modules in the system. Instead, they appeared to perform a comprehensive survey of the EHRYourWay architecture. The suspect accounts collectively accessed close to one thousand unique application endpoints, the vast majority of which were never touched by any legitimate WC Health user.

65. Beyond this activity, Commure's agents interfered with sensitive data. In a stunning breach of clinical integrity, these unauthorized users created and, in some instances, signed off on 48 clinical notes in real patient charts. This behavior is entirely inconsistent with "billing support" and deeply invasive of patient privacy.

66. By tracking the IP addresses accessing its system, Adaptamed further discovered that the credentials of WC Health employees like Stephany Guerrero were also being shared as early as August 4, 2025. What started as one compromised WC Health account multiplied into three unlawfully shared accounts

LARSON
LOS ANGELES

17

COMPLAINT

Case No.

as Adaptamed continued its investigation.

67. Adaptamed's investigation further revealed that the three suspicious "biller" accounts—along with the credentials of WC Health employees Stephany Guerrero, Maria Razon, and Harchiel Paul Librea—were accessed simultaneously from locations where WC Health has no presence, but where Commure maintains significant operations, such as Mountain View, California; Dhaka, Bangladesh; and Gurgaon, India. Often, the gaps between requests from these locations was zero seconds. On over 70 occasions, for example, Guerrero's credentials were used in as many as five different global locations on the same day—a physical impossibility for a legitimate user. Five different global locations is also implausible for a single user even if the user was utilizing a VPN. Additional analysis of Guerrero's account shows that up to 75% of her traffic during the suspect time period originated from locations other than her ordinary Philippine-based location, and the hours she "worked" shifted to match the suspect accounts. This evidence of access plainly contrasts with Guerrero's historical access patterns. Between January 2025 and July 2025, Guerrero only accessed her accounts from the Philippines (where she resides) and Las Vegas (WC Health's headquarters location).

68. Upon information and belief, many of the domestic locations where Guerrero's credentials were found to have been used are common locations of data centers, indicating a VPN was also used to access the Adaptamed system. Before August 2025, Guerrero had never used a VPN to access EHRYourWay.

69. Commure's attempts to infiltrate the system did not stop even after Adaptamed identified the breach, suspended the three suspicious accounts (IDs 2218, 2219, and 2220) on February 12, 2026, and sent cease-and-desist letters to both WC Health and Commure demanding a stop to the apparent unauthorized access and improper use of credentials. In a display of staggering hubris, Commure continued attempting to access Adaptamed's system using Guerrero's credentials well into March 2026. And Commure successfully did access the EHRYourWay

system in March 2026 by surreptitiously using the credentials of WC Health employees Razon and Librea.

70. Adaptamed did not authorize WC Health to provide credentials to Commure for any purpose. Commure's use of credentials to conduct its own competitive analysis, supplement its product development, and steal Adaptamed's proprietary information was a flagrant, unauthorized intrusion into Adaptamed's system.

71. Upon information and belief, Commure used its unauthorized access to copy confidential platform details, including proprietary features, user interface layouts, and the logics that Dr. Prathipati spent more than a decade perfecting. Upon information and belief, Commure used this information to develop and refine—to bridge the gap—in its own lightweight EHR system to obtain an unlawful competitive advantage. Commure further used its unauthorized access to ease its unlawful interference with the long-standing contractual relationship between Adaptamed and WC Health.

72. In addition to the unauthorized access and copying, Adaptamed's investigation reveals that Commure leveraged, solicited, and diverted WC Health, with whom Adaptamed had had a longstanding relationship, and may be attempting to divert other Adaptamed clients to its own competitor product, Athelas Air, which, upon information and belief, has been built and improved in whole or in part from Adaptamed's proprietary information.

**D.      Commure's Actions Violated the Contract Between Adaptamed and WC Health**

73. For 10 years, Adaptamed treated WC Health as a premier partner, providing white-glove service based on mutual trust. WC Health repaid that loyalty by allowing a dangerous and hostile competitor into Adaptamed's system.

74. This was no simple mistake. WC Health's leadership actively colluded with Commure to bypass Adaptamed's security protocols. They worked in tandem

to allow Commure agents to trespass into Adaptamed's system, secretly export data and information, and mine proprietary architecture.  Not only were these actions unlawful, but they also violated the written agreement governing Adaptamed's provision of services to WC Health.

75. In 2015, WC Health first entered into an agreement to use Adaptamed's products, commencing their business relationship.  The relationship between Adaptamed and WC Health is governed by the contract between them.  The current contract is a renewable term contract entered into by the parties on July 1, 2021, and was not set to expire until July 1, 2026 (attached as **Exhibit A**).

***1.  The Contract Contains Use Provisions and Confidential Information Provisions***

76. Under Section 5 of the contract, containing a confidentiality agreement, WC Health is required to take "all reasonable precautions necessary to safeguard" Adaptamed's confidential information from disclosure, as required by the contract:

"Confidential Information" means the terms of this Agreement, the Services, any software provided by Adaptamed under this Agreement, the logon identifiers and passwords provided to Customer and its Authorized Users, the fees charged under this Agreement, patient records and claims, and any other materials marked confidential by Customer or Adaptamed and any other information conveyed under this Agreement that is identified in writing as confidential at the time of its conveyance. Each party acknowledges and agrees that: (a) the Confidential Information constitutes valuable trade secrets of the party owning such Confidential Information; (b) it will use Confidential Information solely in accordance with the provisions of this Agreement; and (c) it will not disclose, or permit to be disclosed, the Confidential Information of the other party to any third party without the disclosing party's prior written consent.  Each party will take all reasonable precautions necessary to

LARSON
LOS ANGELES

Case No.

safeguard the confidentiality of the other party's Confidential Information including, at a minimum, those precautions taken by a party to protect its own Confidential Information, which will in no event be less than a reasonable degree of care.  Confidential Information will not include information that is: (i) publicly available; (ii) already in the other party's possession and not subject to a confidentiality obligation; (iii) obtained by the other party from any source without any obligation of confidentiality; (iv) independently developed by the other party without reference to the disclosing party's Confidential Information; or (v) required to be disclosed by order of a court or other governmental entity; provided no less than ten (10) days' notice is given to the party owning such Confidential Information so that such party may obtain a protective order or other equitable relief.

Crucially, not only did WC Health recognize through this provision that Adaptamed's system had tremendous value, but it also acknowledged that Adaptamed's confidential information constitutes valuable trade secrets.

77. Further, section 1.1 of the contract bars WC Health from disclosing usernames and passwords, divulging Adaptamed's software, or otherwise providing confidential information to third parties:

Access Rights. Adaptamed hereby grants Customer, during the Term, a limited, revocable, nontransferable and non-exclusive right for **Customer's employees** ("Authorized Users") to receive the Services in accordance with the parameters described in the Specifications for Modules and Fees (both Services and Implementation Fees) subscription Order Form described on Exhibit A, solely for Customer's internal business purposes consistent with the terms and conditions of this Agreement.

(Emphasis added.)  This provision does not provide for—and WC Health never sought—an allowance for WC Health to transfer credentials to third-party consultants, contractors, or competitors such as Commure.

78. Under section 1.2, Adaptamed retains absolute ownership over the keys to its digital house.  WC Health is required to "ensure that each Authorized User will: (a) not disclose their logon identifier to any other person or entity; (b) not permit any other person or entity to use their logon identifier; and (c) use the Service Solely in accordance with the terms and conditions of this Agreement."  The full text of the provision is provided below:

> Administration.  Adaptamed will issue Authorized User(s) ("Administrator") an individual logon identifier and password ("Administrator's Logon") for purposes of administering the Services. Using the Administrator's Logon, the Administrator shall assign each remaining Authorized User a unique logon identifier and password and assign and manage the business rules that control each such Authorized User's access to the Services.  Customer shall ensure that each Authorized User will: (a) not disclose their logon identifier to any other person or entity; (b) not permit any other person or entity to use their logon identifier; and (c) use the Service Solely in accordance with the terms and conditions of this Agreement.

79. Importantly, the contractual provisions and restrictions governing login credentials, and specifically prohibiting the sharing of credentials, are critical to ensuring compliance with HIPAA.

80. Under section 1.5, WC Health and its Authorized Users agreed to not "provide, disclose, divulge or make available to, or permit use of the Services by, any third party," "create derivative works from [or] reverse engineer" any software, or "engage in or allow any action involving the Services that is inconsistent with this Agreement." The full text of the provision is provided below:

LARSON
LOS ANGELES

22
COMPLAINT

Case No.

Restrictions. Customer and its Authorized Users will not: (a) sell, lease, assign, transfer, distribute, license or sublicense the Services; (b) modify, change, alter, translate, create derivative works from, reverse engineer, disassemble or decompile the Services or any software included in the Services; (c) provide, disclose, divulge or make available to, or permit use of the Services by, any third party; (d) copy or reproduce all or any part of the Services; (e) interfere, or attempt to interfere, with the Services in any way; (f) engage in spamming, mail bombing, spoofing or any other fraudulent, illegal or unauthorized use of the Services; (g) introduce into or transmit through the Services any virus, worm, trap door, back door, timer, clock, counter or other limiting routine, instruction or design; (h) remove, obscure or alter any copyright notice, trademarks or other proprietary rights notices affixed to or contained within the Services; or (i) engage in or allow any action involving the Services that is inconsistent with this Agreement.

The plain language of this provision expressly prohibits attempts to deconstruct, reverse engineer, or replicate Adaptamed's system. Additionally, the provision prohibits the introduction of backdoors or, effectively, the use of bots.

### 2. WC Health Attempts to Terminate the Contract and Adaptamed Discovers its Material Breaches

81. Adaptamed discovered WC Health's unlawful scheme with Commure after WC Health's attempts to terminate the contract in violation of the clear term and termination provisions.

82. On February 3, 2026, WC Health's CIO, John Hong, gave notice that WC Health would be migrating an unknown number of users to Commure's Athelas Air. On February 9, 2026, Hong emailed WC Health's "official notice and formal request to begin transferring [their] clinical users" to "an alternative EHR system by

LARSON
LOS ANGELES

23

COMPLAINT

Case No.

2/28." Hong's email was paired with an attachment that requested Adaptamed to "provide all Practice patient data . . . within 14 days from the date of this letter." WC Health later admitted that Hong's February 9, 2026 communication was actually written by Commure.

83. On Friday, February 13, 2026, Adaptamed's COO responded to Hong's notice, explaining that this partial termination was not contemplated by the contract. WC Health's COO Max Casal responded by referring to the language of an earlier contract, which had been superseded.

84. In light of the red flags concerning the rapid development of Commure's system raised by Hong's statements, Adaptamed began an investigation into WC Health's user activity, which revealed Commure's back-door access to Adaptamed's system and use of bots. On February 12, 2026, Adaptamed suspended access to the three unlawful accounts. Shortly thereafter, on February 18, 2026, Adaptamed provided formal notice of breach and the suspensions, triggering a contractual 30-day cure period. After WC Health failed to cure, Adaptamed terminated the contract on March 21, 2026, pursuant to section 7.2 of the contract, and again demanded that WC Health immediately cease and desist from unlawfully granting Commure access to EHRYourWay. (See **Exhibits B** & **C**.)

85. Even after notice was provided through counsel on February 18, 2026, the wrongful conduct continued and even increased. Two more employee accounts, those of Maria Rozan and Harchiel Paul Librea, were also determined to be wrongfully sharing credentials.

86. On March 6, 2026, Adaptamed's counsel sent Commure's counsel a cease-and-desist letter that included details about Commure's use of Guerrero's logins to access the system. Undeterred, Commure continued to attempt to use Guerrero's logins to access the EHRYourWay system. So many attempts were made, that Guerrero's account got locked out. Adaptamed had to reset Guerrero's password again and notified WC Health of this on March 15, 2026.

87. WC Health has materially breached the contract in numerous ways, including but not limited to the following:

- Violating Sections 1.1 and 1.2 by secretly sharing credentials with Commure agents.
- Violating Section 1.5 by making the system available to an unknown and undisclosed third-party competitor in a way that allowed the competitor to access Adaptamed's trade secrets and confidential information.
- Violating Section 1.5 by permitting the use of automated back-door scripts to query the system.
- Violating Section 5 by failing to take all reasonable precautions to safeguard Adaptamed's trade secrets, choosing to instead hand those secrets to a rival.

88. WC Health's breaches were compounded by its bad-faith response to being caught. On February 18, 2026, Adaptamed's counsel issued a formal notice of breach, describing the unusual activity and suspending the three suspicious accounts pursuant to the contract to prevent further harm.

89. Adaptamed's notice also included a demand for basic transparency: who were the users of the accounts, and where were they located? WC Health and Commure, however, have steadfastly refused to provide answers to any of Adaptamed's questions. Instead, WC Health's counsel offered the hollow pretext that the accounts were used "solely for billing"—an excuse utterly refuted by the evidence showing the activity actually occurring in Adaptamed's system, such as the use of automated Python scripts and the creating of clinical notes.

90. WC Health did not merely share credentials, it actively conspired with Commure to facilitate an intrusion into Adaptamed's system. Working in concert with Commure, WC Health allowed an unauthorized third-party competitor to bypass Adaptamed's security protocols and gain unauthorized access to

LARSON
LOS ANGELES

25

COMPLAINT

Case No.

EHRYourWay so that Commure could secretly access the EHRYourWay system that houses Adaptamed's confidential information to study and probe the product and export data.

91. This devious misconduct was designed to allow Commure to study Adaptamed's mature and well-developed product, and to provide Commure with a functional blueprint of a system that took more than a decade to build. Upon information and belief, Commure engaged in its illicit activities to enhance its own EHR system into one that is capable of serving the behavioral health market and improve and enhance the features of its own version of EHRYourWay to compete with Adaptamed in that market. Commure was able to bridge the gap between its lightweight EHR offering and EHRYourWay in only a matter of months, instead of years.

### 3. Adaptamed is Forced to Terminate the Contract

92. Under Section 7.1, the contract automatically renews every year for an additional year, unless either party gives 90 days' advance notice before the renewal. In other words, if WC Health wanted to get out of the current contract by not renewing it, that needed to happen by April 2, 2025, which was 90 days before the automatic one-year renewal date of July 1, 2025. That did not happen. As a result, the current contract would have remained in place until July 1, 2026.

93. Section 7.1 reads, in full, as follows:

Term. The initial term of this Agreement shall be for one year specified on the Subscription Order Form. After expiration of the initial term specified on the Subscription Order Form, the Customer's subscription to the service shall automatically renew for successive one (1) year periods (the initial term and each renewal term, a "Term") unless either party provides written notice of non-renewal at least ninety (90) days prior to commencement of the applicable renewal term. For any subsequent renewal term, Adaptamed shall give Customer written notice

of any increase in the Fees at least 90 days prior to commencement of the new term.

94. Relatedly, Section 7.3 of the contract says WC Health may terminate the contract only "upon notice to Adaptamed . . . if Adaptamed is in material breach of [the contract] and Adaptamed fails to remedy such material breach within thirty (30) days of its receipt of such notice." The full text of the provision is provided below:

Termination by Customer. Customer will have the right, upon notice to Adaptamed, to terminate this Agreement if Adaptamed is in material breach of this Agreement and Adaptamed fails to remedy such material breach within thirty (30) days of its receipt of such notice.

95. Despite Adaptamed's full compliance with the contract, on February 3, 2026, WC Health's CIO informed Adaptamed that it should expect a termination notice. On February 5, 2026, Kenny Fukimoto, the assistant to WC Health's Chief Operating Officer, further confirmed that Adaptamed should expect a termination notice from WC Health.

96. Adaptamed has not committed any breach of the contract, much less a material one. Adaptamed has not received from WC Health any notice of any material breach of the contract, nor has Adaptamed had any opportunity to remedy any such breach. Accordingly, WC Health was not permitted to terminate the contract unless an event occurred under these circumstances. No such event occurred. The only party entitled to terminate the contract for material breach is Adaptamed, not WC Health.

97. Pursuant to Article 7.2 of the contract, WC Health had 30 days from the date Adaptamed notified it that it was in breach of the contract to cure its breach. The 30-day cure window expired on March 20, 2026. Not only did WC Health fail to cure—or otherwise substantively respond to Adaptamed's breach communications at all—but Adaptamed's continuing investigation showed that WC Health continued to breach the contract and expand the scope of its breaches during

the cure period.

98. Upon information and belief, WC Health shared, continued to share, or otherwise allowed improper access to Adaptamed's trade secrets and confidential information with Commure, which contributed to the extremely rapid development of Commure's new EHR system.

99. On March 21, 2026, as a consequence of these uncured and continuing material breaches, Adaptamed notified WC Health that it was terminating the contract.

100. While Adaptamed has exported WC Health's data at WC Health's request, WC Health has to date failed to pay a contractually mandated data export fee.

## FIRST CAUSE OF ACTION

### (Breach of Contract Against Defendant WC Health)

101. Adaptamed repeats, realleges, and incorporates by reference each and all of the allegations contained in the previous paragraphs of this Complaint, as though fully set forth herein.

102. On July 1, 2021, Adaptamed entered into a valid and enforceable contract with WC Health.  That contract is not set to expire until July 1, 2026.

103. At all relevant times, Adaptamed has performed all of its duties under the Contract.

104. WC Health breached several provisions in the contract.  These include Sections 1.1, 1.2, and 1.5.

105. Section 1.1 provides that "Adaptamed hereby grants Customer, during the Term, a limited, revocable, nontransferable and non-exclusive right for Customer's employees ('Authorized Users') to receive the Services in accordance with the parameters described in the Specifications for Modules and Fees (both Services and Implementation Fees) subscription Order Form described on Exhibit A, solely for Customer's internal business purposes consistent with the terms and

LARSON
LOS ANGELES

Case No.

conditions of this Agreement."

106.   Section 1.2 provides that "Adaptamed will issue Authorized User(s) ("Administrator") an individual logon identifier and password ("Administrator's Logon") for purposes of administering the Services.  Using the Administrator's Logon, the Administrator shall assign each remaining Authorized User a unique logon identifier and password and assign and manage the business rules that control each such Authorized User's access to the Services.  Customer shall ensure that each Authorized User will: (a) not disclose their logon identifier to any other person or entity; (b) not permit any other person or entity to use their logon identifier; and (c) use the Service Solely in accordance with the terms and conditions of this Agreement."

107.   Section 1.5 provides that "Customer and its Authorized Users will not: (a) sell, lease, assign, transfer, distribute, license or sublicense the Services; (b) modify, change, alter, translate, create derivative works from, reverse engineer, disassemble or decompile the Services or any software included in the Services; (c) provide, disclose, divulge or make available to, or permit use of the Services by, any third party; (d) copy or reproduce all or any part of the Services; (e) interfere, or attempt to interfere, with the Services in any way; (f) engage in spamming, mail bombing, spoofing or any other fraudulent, illegal or unauthorized use of the Services; (g) introduce into or transmit through the Services any virus, worm, trap door, back door, timer, clock, counter or other limiting routine, instruction or design; (h) remove, obscure or alter any copyright notice, trademarks or other proprietary rights notices affixed to or contained within the Services; or (i) engage in or allow any action involving the Services that is inconsistent with this Agreement."

108.   WC Health breached the contract when it worked with and allowed unauthorized Commure to secretly back door data from Adaptamed's system, to access Adaptamed's trade secrets and confidential information.

LARSON
LOS ANGELES

COMPLAINT

Case No.

109.   Specifically, Sections 1.1, 1.2, and 1.5 were breached by WC Health wrongfully providing Adaptamed accounts for Commure representatives to surreptitiously enable Commure to access Adaptamed's system.  These provisions were further breached when Guerrero shared her logon credentials with members of Commure across the globe, and those members used her credentials to access Adaptamed's system without Adaptamed's permission.

110.   As a direct and proximate result of the various breaches of contract by WC Health, Adaptamed has suffered financial damages, including but not limited to *at least* the money that would have been paid by WC Health, pursuant to the contract, through the end of the contractual term and the contractually mandated data export fee.

## SECOND CAUSE OF ACTION

**(Misappropriation of Trade Secrets under 18 U.S.C. §§ 1836 et seq., and California Uniform Trade Secrets Act Against All Defendants)**

111.   Adaptamed repeats, realleges, and incorporates by reference each and all of the allegations contained in the previous paragraphs of this Complaint, as though fully set forth herein.

112.   Adaptamed owns trade secrets concerning its EHRYourWay confidential platform details. These details include, but are not limited to, proprietary features, user interface layouts, and design structure; functional workflows and operational logic; software behavior and platform capabilities not available to the general public; and customer-facing functionality that provides competitive differentiation.

113.   Adaptamed took reasonable measures to keep its confidential platform details secret.  For example, all EHRYourWay customers, such as WC Health, are required to sign confidentiality agreements as part of their contracts with Adaptamed.  Customers are then granted password protected logon credentials to access the system and are contractually not permitted to share their logon

information. Additionally, Adaptamed's technology is strictly reserved for use by "Authorized Users," and customers are not permitted to share Adaptamed's technology with third parties.

114. Further, Adaptamed's trade secrets have independent economic value. Traditional EHR systems are not designed for behavioral health workflows. Medical EHRs lack behavioral health assessment, screening and clinical documentation tools, cannot handle treatment plan requirements, and do not support the complex authorization, documentation, billing, and reporting requirements that mental health providers navigate daily. Thus, EHRYourWay is an EHR platform engineered and customized specifically for behavioral health operations. Therefore, the trade secrets pertaining to EHRYourWay have independent economic value because the market lacks similar products that serve similar functions. Accordingly, this information is valuable and secret to afford an actual and potential economic advantage over market competitors. Indeed, Adaptamed spent years and significant resources in gathering the information necessary to execute EHRYourWay and fill the void left in the market.

115. WC Health improperly disclosed Adaptamed's trade secrets to Commure when it created logons for Commure to access Adaptamed's EHRYourWay platform, and when Guerrero and others distributed personal logon credentials to Commure. WC Health never had Adaptamed's consent to make these disclosures. WC Health knew that disclosure of this information was wrong because it violated its contract with Adaptamed.

116. Commure improperly acquired Adaptamed's trade secrets by unauthorizedly accessing Adaptamed's EHRYourWay platform, by "back-door" accessing the platform, and by using Python-based programmatic agents to query the platform. Commure knew that acquisition of this information was wrong because it never received authorized access from Adaptamed to receive this information. Indeed, recognizing that it did not have authorized access to the

LARSON
LOS ANGELES

31
COMPLAINT

Case No.

platform, Commure gave multiple people WC Health employee login credentials so that they could surreptitiously access Adaptamed's platform.

117. Defendants were aware that Adaptamed's trade secrets and confidential information were acquired for improper purposes.

118. EHRYourWay is used, and is intended for use in, interstate commerce. The platform was developed in, and is used in, California. It is also used in Las Vegas, Nevada, by WC Health, and across the United States by numerous other clients.

119. Commure's use of Adaptamed's trade secrets to improperly engineer and adapt its own competitor EHR product, Athelas Air, to obtain an unlawful competitive advantage in the marketplace and target and steal Adaptamed's clients has caused Adaptamed actual harm, is continuing to harm Adaptamed, and has unjustly enriched Commure.

120. WC Health's disclosure of Adaptamed's trade secrets to Commure to improperly engineer and adapt Athelas Air has also caused Adaptamed actual harm, is continuing to harm Adaptamed, and has unjustly enriched WC Health.

121. Defendants' misappropriation diminished and continues to diminish Adaptamed's market share and deteriorate the value of Adaptamed's investment in the development of the EHRYourWay trade secrets.

122. Adaptamed is also entitled to exemplary damages and attorneys' fees for willful and malicious misappropriation. Commure's and WC Health's wrongful acts were committed through illegal actions and Defendants' malicious intent to harm Adaptamed. Commure repeatedly and secretly accessed Adaptamed's system without authorization for months, and continued to do so even after Adaptamed conveyed a cease-and-desist demand. Commure further engaged in blatant deception in seeking to obtain information about Adaptamed's system by initiating meetings under the guise of exploring a "partnership" with Adaptamed. The meetings occurred while Commure was already utilizing improperly obtained

LARSON
LOS ANGELES

32
COMPLAINT

Case No.

credentials to scrape Adaptamed's system. These actions are indicative of a calculated and organized conspiracy to steal Adaptamed's trade secrets to improve its system.

## THIRD CAUSE OF ACTION

### (Intentional Interference With Prospective Economic Advantage Against Defendant Commure)

123. Adaptamed repeats, realleges, and incorporates by reference each and all of the allegations contained in paragraphs 1-110 of this Complaint, as though fully set forth herein.

124. An economic relationship existed between Adaptamed and WC Health. This relationship existed for 10 years, was subject to the contract, which had an automatic renewal, and therefore contained the probability of future economic benefit to Adaptamed.

125. Commure knew of Adaptamed's relationship with WC Health. Indeed, it was through WC Health that Commure impermissibly accessed Adaptamed's database. Commure was aware that WC Health was a customer of Adaptamed.

126. Commure's conduct was wrongful because that conduct constitutes violations of unfair competition laws and computer fraud laws.

127. Commure knew and/or intended that its conduct was substantially certain to interfere with Adaptamed business expectancy. Indeed, Commure's goal was to steal WC Health as a customer from Adaptamed.

128. Commure's conduct resulted in actual disruption of the economic relationship between Adaptamed and WC Health. To secure its system, and in light of WC Health's material breaches of the contract arising from its relationship with Commure, Adaptamed was placed into the position of either terminating the Contract to avoid further damage or to continue providing access to WC Health, which was actively providing, and showed it would continue to provide, unauthorized access to Adaptamed's system.

LARSON
LOS ANGELES

33

COMPLAINT

Case No.

129.   As a result of Commure's interference, Adaptamed has suffered harm in that it has lost expected profits.

130.   Adaptamed is also entitled to punitive damages.  Commure's wrongful acts were committed through illegal actions and Commure's malicious intent to harm Adaptamed.  Commure repeatedly and secretly accessed Adaptamed's system without authorization for months, and continued to do so even after Adaptamed conveyed a cease-and-desist demand.  Commure further engaged in blatant deception in seeking to obtain information about Adaptamed's system by initiating meetings under the guise of exploring a "partnership" with Adaptamed.  The meetings occurred while Commure was already utilizing improperly obtained credentials to scrape Adaptamed's system.  These actions are indicative of a calculated and organized conspiracy to steal WC Health as a customer.

## FOURTH CAUSE OF ACTION

### (Intentional Interference With Contractual Relations Against Defendant Commure)

131.   Adaptamed repeats, realleges, and incorporates by reference each and all of the allegations contained in paragraphs 1-110 and 123-130 of this Complaint, as though fully set forth herein.

132.   On July 1, 2021, Adaptamed entered into a valid and enforceable contract with WC Health.  The Contract is not set to expire until July 1, 2026.

133.   Commure knew of Adaptamed's contract with WC Health.  It was through WC Health that Commure impermissibly accessed Adaptamed's database.  Commure was aware that WC Health had a contractual business relationship with Adaptamed.

134.   Commure's intentional acts were designed to induce a breach or disruption of the contractual relationship between Adaptamed and WC Health.  Indeed, Commure's goal was for WC Health to end its contract with Adaptamed, and steal WC Health as a customer.

LARSON
LOS ANGELES

34

COMPLAINT

Case No.

135. Commure's conduct resulted in actual breach of the contract between Adaptamed and WC Health. WC Health breached its contract when it supplied login credentials to Commure.

136. As a result of Commure's interference, Adaptamed has suffered harm in that it has lost expected profits.

137. Additionally, Adaptamed is entitled to punitive damages due to Commure's conduct. Specifically, Commure's wrongful acts were committed through illegal actions and Commure's malicious intent to harm Adaptamed. Commure repeatedly and secretly accessed Adaptamed's system without authorization for months, and continued to do so even after Adaptamed conveyed a cease-and-desist demand. Commure further engaged in blatant deception in seeking to obtain information about Adaptamed's system by initiating meetings under the guise of exploring a "partnership" with Adaptamed. The meetings occurred while Commure was already utilizing improperly obtained credentials to scrape Adaptamed's system. These actions are indicative of a calculated and organized conspiracy to steal Adaptamed's trade secrets to improve its system, and induce a breach of the contract between Adaptamed and WC Health that would allow Commure to steal WC Health as a customer.

## FIFTH CAUSE OF ACTION

**(Unfair Competition in violation of Cal. Bus. & Prof. Code §§ 17200 et seq. Against Defendant Commure)**

138. Adaptamed repeats, realleges, and incorporates by reference each and all of the allegations contained in paragraphs 1-110 and 123-137 of this Complaint, as though fully set forth herein.

139. California Business & Professions Code Section 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Commure fraudulently accessed Adaptamed's EHRYourWay platform, without authorization, to steal Adaptamed's customer, WC Health. Commure's misconduct constitutes unfair

competition in violation of the California Unfair Business Practices Act, Cal Bus. & Prof. Code § 17200, et seq.

140. Commure has engaged in a business practice of ongoing unlawful access of Adaptamed's platform without authorization in violation of Adaptamed's rights, and to compete unfairly against Adaptamed. Unless Defendants' unfair practices against Adaptamed are enjoined, Adaptamed will continue to sustain financial injury and irreparable damage to its business and reputation, and competition will decrease in the market.

141. Commure's conduct was fraudulent because it used WC Health's logon credential to access Adaptamed's platform without authorization.

142. Commure's conduct was unlawful because it violated the CFAA and the Comprehensive Computer Data Access and Fraud Act under California Penal Code § 502.

143. Commure's conduct was unfair because Commure intentionally interfered with Adaptamed's business relationship with WC Health to steal Adaptamed's customers and market share.

144. Commure's wrongful conduct has caused and, if not enjoined, will continue to cause irreparable and continuing harm to Adaptamed, for which it has no adequate legal remedy.

145. Accordingly, Adaptamed is entitled to provisional, preliminary, and permanent injunctive relief. Adaptamed is also entitled to restitution of all monies and property obtained from Adaptamed by Commure as a direct result of its wrongful conduct.

## SIXTH CAUSE OF ACTION

**(Computer Fraud and Abuse Act under 18 U.S.C. § 1030(a)(4)**

**Against All Defendants)**

146. Adaptamed repeats, realleges, and incorporates by reference each and all of the allegations contained in paragraphs 1-110 and 123-145 of this Complaint,

as though fully set forth herein.

147. Defendants knowingly accessed without authorization or exceeded authorized access to a protected computer.

148. Specifically, Commure knowingly accessed Adaptamed's EHRYourWay platform, through WC Health, using a computer.

149. WC Health knowingly exceeded its authorized access when it shared login credentials with Commure, in violation of the Contract.

150. The computers used were protected because they were used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States.

151. Specifically, EHRYourWay is a product owned by Adaptamed, used in interstate commerce, and is only accessible via the internet.

152. Forensic analysis shows that EHRYourWay was accessed by WC Health employees and Commure in (including, but not limited to) Nevada, California, Virgina, Texas, Washington, the Philippines, India, and Bangladesh.

153. Defendants accessed the EHRYourWay platform knowingly and with the intent to defraud Adaptamed.  Through the use of WC Health employee credentials, Defendants led Adaptamed to believe that it was the employees accessing EHRYourWay.  This conduct was unlawful.  It was not until Adaptamed conducted a forensic investigation that Adaptamed became aware that others beside WC Health employees were accessing the platform through shared credentials.

154. By accessing the computer without authorization or exceeding authorized access to the computer, Defendants furthered the intended fraudulent conduct.

155. Defendants obtained Adaptamed's trade secrets from the unauthorized use of the computer.

/ / /

LARSON
LOS ANGELES

37

COMPLAINT

Case No.

156. Defendants' conduct has caused Adaptamed economic harm, in an amount to be determined through proof at trial.

## SEVENTH CAUSE OF ACTION

**(Comprehensive Computer Data Access and Fraud Act under California Penal Code § 502 Against All Defendants)**

157. Adaptamed repeats, realleges, and incorporates by reference each and all of the allegations contained in paragraphs 1-110 and 123-156 of this Complaint, as though fully set forth herein.

158. Adaptamed owns the EHRYourWay technology.

159. Defendants knowingly accessed and, without permission, took and made use of Adaptamed's EHRYourWay data from a computer, computer system, or computer network.

160. Specifically, Commure knowingly accessed Adaptamed's EHRYourWay platform, through WC Health, using a computer or computers.

161. WC Health knowingly exceeded its authorized access when it shared logon credentials with Commure, in violation of the Contract.

162. Defendants accessed the EHRYourWay platform knowingly and with the intent to defraud Adaptamed. Through the use of WC Health employee credentials, Defendants led Adaptamed to believe that it was WC Health employees accessing EHRYourWay. This conduct was unlawful. It was not until Adaptamed conducted a forensic investigation that Adaptamed became aware that others beside WC Health employees were accessing the platform through employee credentials.

163. Defendants did not have authorization to access Adaptamed's confidential information beyond the scope of the Contract.

164. Defendants' conduct has caused Adaptamed economic harm, resulting in compensatory damages, including reasonable costs to investigate the violation and any damages or losses sustained in an amount to be determined through proof at trial.

LARSON
LOS ANGELES

Case No.

## EIGHTH CAUSE OF ACTION

### (Unjust Enrichment Against Defendant Commure)

165.   Adaptamed repeats, realleges, and incorporates by reference each and all of the allegations contained in paragraphs 1-110 and 123-164 of this Complaint, as though fully set forth herein.

166.   Commure improperly received monetary gain and profit from its unlawful access of Adaptamed's EHRYourWay platform and from its interference with Adaptamed's relationship with WC Health.

167.   Commure has no right to retain said financial benefits because Commure did nothing to earn them.

168.   Accordingly, Adaptamed is entitled to restitution of the amount of profits unjustly retained by Commure.

## PRAYER FOR RELIEF

WHEREFORE, Adaptamed prays for a judgment against Defendants and each of them as follows:

a) Finding that Defendants' activities complained of herein are unlawful under federal and California law;

b) Declaring Defendants have misappropriated Adaptamed's trade secrets under DTSA, 18 U.S.C. §§ 1836 *et seq.*, and CUTSA;

c) Granting a permanent injunction under 18 U.S.C. § 1836(b)(3)(A) enjoining Defendants, their businesses and agents, and those persons acting in concert or participation with them, from misappropriating Adaptamed's trade secrets in violation of DTSA and CUTSA;

d) Awarding compensatory damages in an amount to be determined according to proof at trial;

e) Awarding punitive and exemplary damages as the Court finds appropriate;

f) Awarding interest, including prejudgment and post-judgment interest, on the foregoing sums;

LARSON
LOS ANGELES

Case No.

g) Awarding costs;

h) Awarding Adaptamed its reasonable attorneys' fees; and

i) For any and all other relief the Court deems just and proper.

Dated: April 20, 2026                    LARSON LLP


By: _____
Rick Richmond
Amelia L.B. Sargent
Ranja F. Rasul
Jasmine M. Johnson
Attorneys for Plaintiff Adaptamed, LLC